Filed 3/3/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| OSMIN HERNANDEZ-VALENZUELA, <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO, <br><br> Respondent; <br><br> THE PEOPLE, <br><br> Real Party in Interest. | A163992 <br><br> (San Francisco City & County Super. Ct. No. 21005426) |
| ANDRES VALDIVIA TORRES, <br><br> Petitioner, <br><br> v. <br><br> THE SUPERIOR COURT OF THE CITY AND COUNTY OF SAN FRANCISCO, <br><br> Respondent; <br><br> THE PEOPLE, <br><br> Real Party in Interest. | A163996 <br><br> (San Francisco City & County Super. Ct. Nos. 20008445, 21003966) |

1

In these consolidated writ proceedings[1], petitioners Andres Valdivia Torres and Osmin Hernandez-Valenzuela (collectively "petitioners") each seek a writ of mandate or prohibition requiring respondent Superior Court of the City and County of San Francisco to dismiss his case for violating his speedy trial rights under Penal Code section 1382.[2]  Petitioners contend there was no good cause to continue their cases past the statutory deadline.  We disagree and therefore deny each of their petitions.

FACTUAL AND PROCEDURAL BACKGROUND

A.    The COVID-19 Pandemic

On March 4, 2020, Governor Gavin Newsom declared a state of emergency in response to the global outbreak of COVID-19, a "new disease, caused by a novel (or new) coronavirus that has not previously been seen in humans."[3]

On March 16, 2020, the San Francisco Health Officer issued a shelter-in-place order requiring residents of the county to remain in their homes except when engaging in essential activities, and to stay at least six feet apart from other persons when leaving their homes.[4]  A few days later, in an

---

[1]    On our own motion, and having previously consolidated these cases for oral argument, we now consolidate Case No. A163992 and Case No. A163996 for purposes of this opinion.

[2]    All statutory references are to the Penal Code unless otherwise stated.

[3]    See Executive Department State of California, Proclamation of a State of Emergency (Mar. 4, 2020), <https://www.gov.ca.gov/wp-content/uploads/2020/03/3.4.20-Coronavirus-SOE-Proclamation.pdf> [as of Mar. 3, 2022].

[4]    See City and County of San Francisco, Order of the Health Officer No. C19-07 (Mar. 16, 2020), <https://sfbos.org/sites/default/files/20200316_DPH_Order_of_the_Health_Officer_C19-07.pdf> [as of Mar. 3, 2022].

2

attempt to limit the spread of the virus, the Governor issued an executive order requiring all Californians to stay at home except for limited activities.[5]

On March 23, 2020, Chief Justice Tani Cantil-Sakauye, in her capacity as Chairperson of the Judicial Council, issued an emergency statewide order suspending all jury trials and continuing them for a period of 60 days. The Chief Justice also extended by 60 days the time period provided for in section 1382 for holding a criminal trial. In so ordering, the Chief Justice explained: "The [Center for Disease Control], the California Department of Public Health, and local county health departments have recommended increasingly stringent social distancing measures of at least six feet between people, and encouraged vulnerable individuals to avoid public spaces. [¶] Courts cannot comply with these health restrictions and continue to operate as they have in the past. Court proceedings require gatherings of court staff, litigants, attorneys, witnesses, and juries, well in excess of the numbers allowed for gathering under current executive and health orders. Many court facilities in California are ill-equipped to effectively allow the social distancing and other public health requirements required to protect people involved in court proceedings and prevent the further spread of COVID-19. Even if court facilities could allow for sufficient social distancing, the closure of schools means that many court employees, litigants, witnesses, and potential jurors cannot leave their homes to attend court proceedings because they must stay

---

[5]     See Executive Department State of California, Executive Order N-33-20 (Mar. 19, 2020), <https://www.gov.ca.gov/wp-content/uploads/2020/03/3.19.20-EO-N-33-20-COVID-19-HEALTH-ORDER-03.19.2020-signed.pdf> [as of Mar. 3, 2022].

3

home to supervise their children. These restrictions have also made it nearly impossible for courts to assemble juries."[6]

On March 30, 2020, the Chief Justice issued a second statewide emergency order, authorizing superior courts to issue implementation orders that "[e]xtend the time period provided in section 1382 of the Penal Code for the holding of a criminal trial by no more than 60 days from the last date on which the statutory deadline otherwise would have expired."[7]

On April 29, 2020, the Chief Justice issued a third statewide emergency order, stating: "The 60-day continuance of criminal jury trials and the 60-day extension of time in which to conduct a criminal trial under Penal Code section 1382, both of which I first authorized in my order of March 23, 2020, are to be extended an additional 30 days. The total extension of 90 days shall be calculated from the last date on which the trial initially could have been conducted under Penal Code section 1382." The Chief Justice explained the extension applied to those matters for which the last date on which trial could be conducted under section 1382 occurred or would occur between March 16, 2020, and June 15, 2020.[8]

---

[6] See Statewide Order by Hon. Tani G. Cantil-Sakauye, Chief Justice of California and Chair of the Judicial Council (Mar. 23, 2020), < https://newsroom.courts.ca.gov/sites/default/files/newsroom/2020-09/Statewide%20Order%20by%20the%20Chief%20Justice-Chair%20of%20the%20Judicial%20Council%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.pdf> [as of Mar. 3, 2022].

[7] See Statewide Order by Hon. Tani G. Cantil-Sakauye, Chief Justice of California and Chair of the Judicial Council (Mar. 30, 2020), < https://newsroom.courts.ca.gov/sites/default/files/newsroom/document/Statewide%2520Order%2520by%2520the%2520Chief%2520Justice-Chair%2520of%2520the%2520Judicial%2520Council%25203-30-2020.pdf> [as of Mar. 3, 2022].

[8] See Statewide Order by Hon. Tani G. Cantil-Sakauye, Chief Justice of California and Chair of the Judicial Council (Apr. 29, 2020), <

On June 1, 2020, the San Francisco health officer updated the shelter-in-place order to allow outside gatherings but still required that essential government functions comply with social distancing requirements to the greatest extent possible.[9]

On December 3, 2020, the state public health officer issued a new regional stay-at-home order restoring many of the earlier restrictions in an effort to slow the spread of COVID-19 and avoid overwhelming the state's hospitals in response to an unprecedented surge in the level of community spread of COVID-19.[10] The next day, in response to the surge in COVID-19 cases, the San Francisco health officer issued another stay-at-home order requiring residents of the county to once again remain in their homes except when engaging in essential activities.[11] The order was extended on December 30, 2020.[12] The state's regional stay-at-home order was lifted on

https://newsroom.courts.ca.gov/sites/default/files/newsroom/document/Chief_Justice_Statewide_Emergency-Order_04292020S.pdf> [as of Mar. 3, 2022].

[9]    See City and County of San Francisco, Order of the Health Officer No. C19-07e (June 1, 2020), < https://sfbos.org/sites/default/files/20200601_FINAL_signed_Health_Officer_Order_C19-07e_updated-Shelter_in_Place.pdf> [as of Mar. 3, 2022].

[10]    See California Department of Public Health, Regional Stay At Home Order (Dec. 3, 2020), < https://www.gov.ca.gov/wp-content/uploads/2020/12/12.3.20-Stay-at-Home-Order-ICU-Scenario.pdf> [as of Mar. 3, 2022].

[11]    See City and County of San Francisco, Order of the Health Officer No. C19-07p (Dec. 4, 2020), <https://sfbos.org/sites/default/files/2020.12.04_FINAL_Signed_Health_Officer_Order_C19-07p-Stay_Safer_at_Home.pdf> [as of Mar. 3, 2022].

[12]    See City and County of San Francisco, Order of the Health Officer No. C19-07q (Dec. 30, 2020), <https://sfbos.org/sites/default/files/2020.12.30_FINAL_Signed_Health_Officer_Order_C19-07q-Stay_Safer_at_Home_updated.pdf> [as of Mar. 3, 2022].

January 25, 2021,[13] and the San Francisco health officer allowed for certain businesses and other activities to reopen starting on January 28, 2021.[14]

On June 15, 2021, the San Francisco health officer's "Safer Return Together" order came into effect.[15] The order rescinded the previous stay-at-home order and lifted indoor capacity limits and social distancing requirements.

### B. Trial Court Proceedings Against Valdivia Torres

On September 17, 2020, an information in Case No. 20008445 charged Valdivia Torres with making criminal threats (§ 422); false imprisonment (§ 236); and exhibiting a deadly weapon (§ 417, subd. (a)(1)).

On September 28, 2020, Valdivia Torres was arraigned in Case No. 20008445 on these charges and entered not guilty pleas and a general time waiver. Days later, he was granted a mental health diversion and became subject to monitoring through the behavioral health court. On February 16, 2021, a bench warrant issued for failure to appear at a hearing.

On April 20, 2021, Valdivia Torres was arrested for actions giving rise to a new felony complaint and information. At a hearing on April 23, 2021, in

---

[13] See California Department of Public Health, Regional Stay At Home Order (Dec. 3, 2020), <https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/COVID-19/Regional-Stay-at-Home-Order-.aspx> [as of Mar. 3, 2022].

[14] See City and County of San Francisco, Order of the Health Officer No. C19-07s (Jan. 27, 2021), <https://sfbos.org/sites/default/files/1%202021.01.27%20FINAL%20Signed%20Order%20No.%20C19-07s%20-%20Stay%20Safer%20at%20Home%20Order.pdf> [as of Mar. 3, 2022].

[15] See City and County of San Francisco, Order of the Health Officer No. C19-07y (July 8, 2021), <https://sfbos.org/sites/default/files/2021.07.08%20FINAL%20Health%20Officer%20Order%20No.%20C19-07y%20%28update%29.pdf> [as of Mar. 3, 2022].

Case No. 20008445, Valdivia Torres withdrew his general time waiver, and the court fixed June 22, 2021 as his statutory last day for trial in that case under section 1382.

On June 3, 2021, an information in Case No. 21003966 charged Valdivia Torres with child endangerment (§ 273a(a)); two counts of assault with a deadly weapon–not a firearm (§ 245(a)(1)); battery (§ 242); and disobeying domestic relations court order resulting in physical injury (§273.6(b).) On June 16, 2021, he was arraigned on these charges and entered not guilty pleas. He did not waive time, and respondent court fixed August 16, 2021 as his statutory last day for trial under section 1382.

On June 22, 2021, the court called Case No. 20008445 for trial. The court found "extraordinary and exceptional circumstances" existed which constituted good cause to continue his trial past the last day. The court described the onset of the "life threatening" COVID-19 pandemic which at that point had caused over 33 million Americans to be infected and over 600,000 deaths. It took judicial notice of all orders issued by the Governor, mayor of San Francisco, the Departments of Public Health for the state and City and County of San Francisco, and the Chief Justice and Judicial Council related to the COVID-19 emergency, as well as all of respondent court's orders regarding facilities and operating procedures under the COVID-19 emergency. Recounting the Governor's March 4, 2020 state of emergency and San Francisco's subsequent emergency shelter in place orders, the court explained that it had been "required to reduce the number of operational courtrooms" from 20 to 5 ½ to cover "necessary calendar matters." This was due to "huge staff reductions," "related childcare issues," and the high medical risk posed by COVID-19 for staff or their households. After several weeks, the court was able to resume most of its functions with "serious

7

limitation[s]." On December 4, 2020, a new shelter-in-place order was issued that caused the court to again suspend jury trials until January 8, 2021.

The court further explained that between April 2020 and June 2021, "social distancing requirements vastly restricted the amount of seating within each courtroom, the jury assembly room, the public hallways outside the courtroom, and the lobby area at the . . . Hall of Justice criminal courthouse." Social distancing requirements limited the number of people in an elevator, use of stairwells, and the jury assembly room. Given the social distancing restrictions and relocations of other courts to trial courtrooms, "the criminal court was down from 10 to 4 trial courtrooms each with a satellite courtroom to accommodate . . . jury selection[s] and to provide a public gallery to ensure a public trial." The court also noted that use of the Civic Center Courthouse had not been a viable option for felony or violent misdemeanor cases because of the inability to provide adequate security in that building. Therefore, the only criminal trials that could proceed at that location were nonviolent misdemeanor trials.

After citing several authorities supporting its good cause finding, the court discussed the "large backlog of no[-]time[-]waiver cases," noting there were 357 no-time-waiver felony cases pending with 168 defendants in custody. With the lifting of social distancing requirements, additional courtrooms at both the Hall of Justice and Civic Center Courthouse were being opened to handle ready no-time-waiver cases. It was the court's plan to have some Hall of Justice courtrooms available to hear in-custody no-time-waiver trials, and some hear out-of-custody felony and violent misdemeanor trials, even if the in-custody trials had later last days given the court's sensitivity that "those who wait trial with a loss of liberty have a heightened need for resolution than those who await trial out of custody."

8

The court elaborated on additional mitigation efforts underway to assist with resolving cases short of trial, including quadrupling the weekly hearing capacity of section 995 motions from 5 to 20 per week, expanded pretrial motions to suppress, and providing additional judges for settlement conferences to aid in the early disposition of cases. The court indicated it would continue further communications with its justice partners to solicit their input on which trials should go out based on agreed upon priorities.

It further stated, "Continued access to the courts and Constitutional due process requirements to provide defendants with the timely hearing of their cases are of the greatest import to this court. But the exceptional and extraordinary circumstances which severely limited this Court in providing a speedy trial to defendants continues, and it constitutes good cause to continue their trial beyond the statutory last day."

Over Valdivia Torres's objection to the court's good cause finding, the court continued his jury trial in Case No. 20008445 to September 2, 2021.

On July 30, 2021, the court granted the prosecution's motion to consolidate Case Nos. 20008445 and 21003966. The now-consolidated information charged Valdivia Torres with the eight counts collectively alleged in the earlier informations.

On August 16, 2021 ("August 16"), the court called Valdivia Torres's consolidated case for trial and arraignment on the new consolidated information. The court again issued its findings of "extraordinary and exceptional circumstances constituting good cause" to continue Valdivia Torres's trial past his last statutory day. The court largely repeated the findings made on June 22, 2021. It also provided updated figures on its backlog, noting there were now 402 felony no-time-waiver cases pending with

9

217 defendants in custody. Again, over Valdivia Torres's objection to the good cause findings, the court continued his jury trial.

On September 2, 2021 ("September 2"), the court again called Valdivia Torres's consolidated case for trial. The court reincorporated its earlier findings of extraordinary and exceptional circumstances constituting good cause to continue Valdivia Torres's trial beyond the statutory last day, stating that "[t]hose circumstances continue to exist." The court also updated its current backlog of no time waiver trials, noting 414 no-time-waiver felony cases pending with 212 defendants in custody. The court added that since June 22, 2021—Valdivia Torres's previous last day in Case No. 20008445—the court had arraigned 135 felony matters of which 130 were set for trial on a no time waiver basis. Over petitioner' objection, the court continued his jury trial to December 15, 2021.

On October 14, 2021, Valdivia Torres moved to dismiss his case for violating his speedy trial rights under section 1382 and the Sixth Amendment to the U.S. Constitution. The court denied the motion.

### C. Trial Court Proceedings against Hernandez-Valenzuela

On July 19, 2021, an information in Case No. 21005426 charged Hernandez-Valenzuela with discharge of a firearm (§ 246.3, subd. (a)); exhibiting a concealed firearm in public (§ 417, subd. (a)(2)(A)); possession of a firearm by a felon (§ 29800, subd. (a)(1)); convicted person carrying a firearm (§ 25850, subd. (a)); convicted person having a concealed firearm in a vehicle (§ 25400, subd. (a)(1)); evading an officer with willful disregard (Vehicle Code, § 2800.2, subd. (a)); possession of ammunition (§ 30305, subd. (a)(1)); and resisting destruction or delaying of a peace officer (§ 148, subd. (a)(1)). On July 26, 2021, he was arraigned on these charges, entered not guilty pleas, and requested a jury trial on a no-time-waiver basis.

10

On September 24, 2021 ("September 24"), the court called Case No. 21005426 for trial. The court noted it was the last statutory day, and the parties announced ready. The court found "exceptional and extraordinary circumstances" existed which constituted good cause to continue Hernandez-Valenzuela's trial past the statutory last day. As it had done when it continued Valdivia Torres's trial, the court described the "life threatening" COVID-19 pandemic and noted the increase in the number of infected Americans (over 39 million) and the number of deaths (over 621,000) attributable to the virus. Likewise, it took judicial notice of all the government-issued orders related to the COVID-19 emergency that had been taken in the Valdivia Torres proceeding. It also issued findings largely similar to the ones issued by the court in Valdivia Torres's case to support its good cause finding. In explaining the insufficient security at the Civic Center Courthouse for criminal trials other than nonviolent misdemeanor trials, the court added that there were not enough bailiffs to cover each courtroom and that the San Francisco Sheriff's Office was already overextended at the jails and the Hall of Justice. The court also provided updated figures regarding its backlog, noting that there were now 437 felony no-time-waiver cases with 232 defendants in custody. The court repeated, "Continued access to the courts and constitutional due process requirements to provide defendants with timely hearing of their cases are of the greatest import to this court, but the exceptional and extraordinary circumstances which severely limit this court in providing a speedy trial to the defendant constitutes good cause to continue defendant's trial beyond the statutory last day." Over Hernandez-Valenzuela's objection, the court continued his jury trial to February 25, 2022.

On October 13, 2021, Hernandez-Valenzuela moved to dismiss his case for violating his speedy trial rights under section 1382 and the Sixth Amendment to the U.S. Constitution. The court denied the motion.

## D. Petitioners' Writ Proceedings

On November 24, 2021, Valdivia Torres and Hernandez-Valenzuela separately petitioned for a writ of mandate or prohibition seeking the dismissal of his case based on the violation of his speedy trial rights without good cause.[16] On December 22, 2021, in both proceedings, we issued orders to show cause ("OSC") to the People as the Real Party in Interest why the relief requested by petitioners should not be granted.[17] On January 14, 2022, Real Party in Interest represented by the San Francisco District Attorney ("Real

---

[16] Around this time, other additional writ petitions were filed in the First District Court of Appeal asserting similar claims: *Cook v. Superior Court*, Case No. A163907 and A163924 (filed Nov. 12, 2021); *Gulakov v. Superior Court*, Case No. A163925 (filed Nov. 15, 2021); *Sylvester v. Superior Court*, Case No. A163945 (filed Nov. 17, 2021); *Kloster v. Superior Court*, Case No. A163950 (filed Nov. 18, 2021); *Gonzalez-Warren v. Superior Court*, Case No. A163990 (filed Nov. 24, 2021); *Ortiz v. Superior Court*, A163993 (filed Nov. 24, 2021); *Taylor v. Superior Court*, Case Nos. A163994 and A163995 (filed Nov. 24, 2021); *Zhao v. Superior Court*, Case No. A163997 (filed Nov. 24, 2021); *Sullivan v. Superior Court*, Case No. A163998 (filed Nov. 24, 2021); and *Jones v. Superior Court*, Case No. A163999 (filed Nov. 29, 2021).

[17] In both matters, we invited briefing from the respondent court on three questions: (1) why was it not possible to send Petitioner's case to one of the Hall of Justice's criminal trial courtrooms not conducting a criminal trial on August 16, 2021, and September 2, 2021, when his case was called for trial; (2) why the courtrooms in the Civic Center Courthouse could not be used to try out-of-custody felony defendants, in trials where all witnesses are also out of custody since respondent court's reopening on June 28, 2021; and (3) what measures has the court undertaken to prioritize in-custody, no-time-waiver felony criminal trials to avoid infringing defendants' speedy trial rights since its reopening. The respondent court submitted letter responses addressing the questions posed in the OSC.

Party" or "District Attorney") filed answers and returns to the petitions. On January 26, 2022, each petitioner filed a traverse/reply.

On January 18, 2022, we consolidated the two writ proceedings for purposes of oral argument. On February 9, 2022, petitioners (represented by the same counsel) and Real Party (also represented by the same counsel) appeared for oral argument.

On February 18, 2022, Valdivia Torres notified us that his case was to be advanced to trial on February 22, 2022. On February 22, 2022, Real Party informed us that Valdivia Torres's trial had begun and that jury selection was scheduled for February 24, 2022, and requested that we dismiss Valdivia Torres's writ petition as moot because his trial had begun. The next day, Valdivia Torres submitted a letter response opposing dismissal on mootness grounds.

**DISCUSSION**

Valdivia Torres contends his section 1382 speedy trial rights were violated by the continuances granted on August 16 and September 2, while Hernandez-Valenzuela contends his section 1382 speedy trial rights were violated by the continuance granted on September 24. They assert there was no good cause for the continuances and the court abused its discretion in granting them. We disagree.

### A. Mootness

As an initial matter, we reject Real Party's request to dismiss Valdivia Torres's writ petition as moot based on the start of his trial.

A case is considered moot when "the question addressed was at one time a live issue in the case" but has been deprived of life "because of events occurring after the judicial process was initiated." (*Younger v. Superior Court* (1978) 21 Cal.3d 102, 120.) "The pivotal question in determining if a case is

13

moot is therefore whether the court can grant the plaintiff any effectual relief." (*Wilson & Wilson v. City Council v. Redwood City* (2011) 191 Cal.App.4th 1559, 1574.) However, "[w]hen a question of general public concern is involved, particularly in the area of the supervision of the administration of criminal justice, a reviewing court may reject mootness as a bar to a decision on the merits of an issue. [Citation.] Thus, a reviewing court has 'inherent authority' to resolve an issue of broad public interest that is likely to recur, even though an event occurring during the pendency of the case would normally render the matter moot." (*Medina v. Superior Court* (2000) 79 Cal.App.4th 1280, 1285–1286 (*Medina*).)

Even if we assume without deciding that Valdivia Torres's writ petition is now moot, we will not dismiss it. The matters before us are of significant public interest since they bear on the constitutional speedy trial rights of many defendants currently awaiting trial in respondent court well past their statutory last days and respondent court's management of these cases. In light of the backlog facing respondent court as of September 24 (437 felony no-time-waiver cases with 232 of the defendants in custody), the issues are also likely to recur. We therefore conclude that the petition present issues of sufficient public importance that it justifies rejecting mootness as a bar to a decision on the merits. Accordingly, we decline to dismiss Valdivia Torres's petition as moot (see *Medina, supra*, 79 Cal.App.4th at p. 1286 [deciding speedy trial writ petition presented issues of broad public interest likely to recur unless resolved despite dismissal of underlying felony case]) and proceed to the merits of both his and Hernandez-Valenzuela's petitions.

### B. Applicable Law

"The right to a speedy trial is a fundamental right guaranteed by both the Sixth Amendment to the United States Constitution and article I, section

15 of the California Constitution. [Citation.] The purpose of the speedy trial right is '(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired.' [Citation.] 'To implement an accused's constitutional right to a speedy trial, the Legislature enacted section 1382.' " (*Burgos v. Superior Court* (2012) 206 Cal.App.4th 817, 825; see also *People v. Sutton* (2010) 48 Cal.4th 533, 545 (*Sutton*) ["[S]ection 1382 is one of the principal provisions implementing a criminal defendant's statutory right to a speedy trial."].)

Section 1382 prescribes certain time periods within which an accused must be brought to trial. (§ 1382, subd. (a).) The statute provides that, in a felony case, "the court shall dismiss the action when a defendant is not brought to trial within 60 days of his or her arraignment on an indictment or information, unless (1) the defendant enters a general waiver of the 60-day trial requirement, (2) the defendant requests or consents (expressly or impliedly) to the setting of a trial date beyond the 60-day period (in which case the defendant shall be brought to trial on the date set for trial or within 10 days thereafter), or (3) 'good cause' is shown." (*Sutton, supra*, 48 Cal.4th at p. 545; see also § 1382, subd. (a).)

"No affirmative showing of prejudice is necessary to obtain a dismissal for violation of the state constitutional speedy trial right *as construed and implemented by statute*. [Citation.] Instead, 'an unexcused delay beyond the time fixed in section 1382 . . . without defendant's consent entitles the defendant to a dismissal.' " (*People v. Martinez* (2000) 22 Cal.4th 750, 766.)

The prosecution has the burden of establishing good cause to avoid dismissal. (*People v. Johnson* (1980) 26 Cal.3d 557, 569, fn. 12 (*Johnson*); *Rhinehart v. Municipal Court* (1984) 35 Cal.3d 772, 781 (*Rhinehart*) ["The

15

burden of showing good cause is on the prosecution."].)  " '[I]n making its good-cause determination, a trial court must consider all of the relevant circumstances of the particular case, "applying principles of common sense to the totality of the circumstances. . . ." [Citations.]  The cases recognize that, as a general matter, a trial court "has broad discretion to determine whether good cause exists to grant a continuance of the trial" [citation], and that, in reviewing a trial court's good-cause determination, an appellate court applies an "abuse of discretion" standard.' " (*People v. Engram* (2010) 50 Cal.4th 1131, 1162–1163 (*Engram*).)

## C.    Analysis

There is no doubt or dispute that Valdivia Torres was not brought to trial within 60 days of his arraignments, or that Hernandez-Valenzuela has not been brought to trial within 60 days of his arraignment.

In Case No. 20008445, Valdivia Torres withdrew his time waiver on April 23, 2021, so his last statutory day for trial in that case was on June 22, 2021.  On that day, his trial was continued to September 2, 2021, and continued again to December 15, 2021.  In Case No. 21003966, Valdivia Torres was arraigned on June 16, 2021, and never waived time, so his original last day for trial was on August 16, 2021.  After this case was consolidated with the earlier one, on September 2, 2021, it, too, was continued to December 15, 2021.  He did not consent to any of the continuances.  When the continuances were granted on September 2, 2021, about nine weeks had elapsed since his statutory last day (June 22, 2021) in Case No. 20008445, and about two weeks since his last statutory day (August 16, 2021) in Case No. 21003966.

In Case No. 21005426, Hernandez-Valenzuela was arraigned on July 26, 2021, so his last statutory day for trial was September 24, 2021.  On that

16

day, his trial was continued to February 25, 2022. He never waived time, nor did he consent to a continuance.

The issue before us is whether the trial court abused its discretion in finding exceptional and extraordinary circumstances constituting good cause to continue both petitioners' jury trials past their last statutory days.

"Whether or not good cause exists depends on the circumstances of the case." (*Rhinehart*, *supra*, 35 Cal.3d at p. 781.) " '[S]ection 1382 does not define "good cause" as that term is used in the provision, but numerous California appellate decisions that have reviewed good-cause determinations under this statute demonstrate that, in general, a number of factors are relevant to a determination of good cause: (1) the nature and strength of the justification for the delay, (2) the duration of the delay, and (3) the prejudice to either the defendant or the prosecution that is likely to result from the delay.' " (*Engram*, *supra*, 50 Cal.4th at pp. 1162–1163.)

In reviewing a trial court's exercise of its discretion in determining what constitutes good cause, "the appellate courts have evolved certain general principles. The courts agree, for example, that delay caused by the conduct of the defendant constitutes good cause to deny his motion to dismiss. Delay for defendant's benefit also constitutes good cause. Finally, delay arising from unforeseen circumstances, such as the unexpected illness or unavailability of counsel or witnesses constitutes good cause to avoid dismissal." (*Johnson, supra*, 26 Cal.3d at p. 570.)

"[A] broad variety of unforeseen events may establish good cause under section 1382." (*People v. Hajjaj* (2010) 50 Cal.4th 1184, 1198 (*Hajjaj*).) For instance, in *In re Venable* (1927) 86 Cal.App.585, an epidemic of infantile paralysis was prevalent in the town where court sessions were held and prohibited calling juries. (*Id.* at p. 587.) The court concluded the quarantine

17

imposed to prevent the spread of the infectious disease was good cause for the delay of trial and found there was no unreasonable delay in bringing the case to trial after the cessation of the epidemic. (*Id*. at p. 587.) In *People v. Tucker* (2011) 196 Cal.App.4th 1313, the defendant could not appear for trial as he was under quarantine because another inmate had contracted the H1N1 flu virus. (*Id*. at p. 1315.) The court concluded that medical necessity of the defendant's quarantine constituted good cause for the continuance of his trial. (*Id*. at pp. 1317–1318.) More recently, in *Stanley v. Superior Court of Contra Costa County* (2020) 50 Cal.App.5th 164, Division Four of this court concluded the COVID-19 pandemic and impact it has had within the state supported the trial court's finding of good cause to continue the defendant's trial. (*Id*. at p. 166.) The court observed that the COVID-19 pandemic was "of such severity" as to justify a 90-day continuance and observed that courts were places of high risk during the pandemic given they involved gatherings of judges, court staff, litigants, attorneys, witnesses, defendants, law enforcement, and juries in excess of the numbers allowed for gatherings under the then applicable executive and health orders. (*Id*. at pp. 169–170 ["Health quarantines to prevent the spread of infectious diseases have long been recognized as good cause for continuing a trial date."].)

In contrast, "[d]elay attributable to the fault of the prosecution . . . does not constitute good cause. Neither does delay caused by improper court administration." (*Johnson, supra*, 26 Cal.3d at p. 570.) In *Johnson*, the Supreme Court considered whether court congestion could excuse compliance with the time limits of the speedy trial statute. (*Id*. at p. 569.) It recognized that "the purpose of the state constitutional protection of the right to a speedy trial is 'to protect those accused of crime against possible delay, caused either by willful oppression, or the neglect of the state or its officers.' "

18

(*Id.* at p. 571.)  Included in this group were the judiciary, and "oppression" and "neglect" could include the failure to provide the facilities and personnel needed to implement the right to speedy trial.  (*Ibid.*)  " '[U]nreasonable delay in run-of-the-mill criminal cases cannot be justified by simply asserting that the public resources provided by the State's criminal-justice system are limited and that each case must await its turn.' "  (*Ibid.*)

The *Johnson* court quoted the following passage relating to the problem of delay caused by court congestion, set forth in the American Bar Association's Standards for Speedy Trial:  " '[D]elay arising out of the chronic congestion of the trial docket should not be excused. . . .  [¶] . . .  But, while delay because of a failure to provide sufficient resources to dispose of the usual number of cases within the speedy trial limits is not excused, the standard does recognize congestion as justifying added delay when *attributable to exceptional circumstances.*"  Although it is fair to expect the state to provide the machinery needed to dispose of the usual business of the courts promptly, it does not appear feasible to impose the same requirements when certain unique, nonrecurring events have produced an inordinate number of cases for court disposition.' "  (*Johnson, supra*, 26 Cal.3d at p.  571, emphasis added [citing ABA Project on Standards for Crim. Justice, Stds. Relating to Speedy Trial (Approved Draft 1968) pp. 27–28].)  In elaborating upon the type of "unique, nonrecurring events" that would constitute "exceptional circumstances," this document states: "[W]hen a large-scale riot or other mass public disorder has occurred, some leeway for additional time is required to ensure that the many resulting cases may receive adequate attention from the prosecutor's office, defense counsel (possibly a single public defender office), and the judiciary."  (See *Engram, supra*, 50 Cal.4th 1131, 1164, fn.12; see also *People v. Cole* (2008) 165 Cal.App.4th Supp 1, 17

["Exceptional circumstances are defined as unique, nonrecurring events which have produced an inordinate number of cases for court disposition."].)

In *Engram*, *supra*, 50 Cal.4th 1131, the basis of the delay was the unavailability of a judge or courtroom to try defendant's case within the presumptive statutory period. (*Id.* at p. 1163.) Engram's case was in Riverside County Superior Court, which had been "severely overburdened by the substantial number of criminal cases awaiting trial in that county." (*Id.* at p. 1136 [citing report of task force established to assess and assist with backlog that 25% of inmates had been awaiting trial for more than a year, 170 had been waiting more than two years, and 32 had been waiting more than 4 years].) Engram's last day for trial was July 28, 2008. (*Id.* at p. 1139.) After the court granted one continuance requested by Engram and three continuances requested by the prosecution, the parties agreed that September 29, 2008, was the last day for trial. (*Id.* at p. 1140.) That day, when the case was called, Engram announced ready. (*Ibid.*) However, that day there were 17 other last day cases before the court, each which presented a statutory speedy trial issue similar to Engram's. (*Ibid.*) The trial court informed the parties that there were no available courtrooms to which the case could be assigned for trial. (*Id.* at p. 1141.) Upon hearing Engram's motion to dismiss the following day, the court dismissed the case due to a lack of judge and a courtroom to timely try his case. (*Id.* at p. 1144.) The Court of Appeal concluded the trial court did not abuse its discretion in determining there was no good cause to delay Engram's trial beyond the last day. (*Id.* at pp. 1146–1147.)

The Supreme Court directly rejected the Riverside District Attorney's assertion that the lack of judge or courtroom constituted good cause to delay the trial until a courtroom became available. (*Engram*, *supra*, 50 Cal.4th at

20

pp. 1162–1163.) It observed that "[p]ast California decisions [have] establish[ed] that when the unavailability of a judge or courtroom is fairly attributable to the fault or neglect of the state, such unavailability does not constitute good cause within the meaning of section 1382." (*Id.* at p. 1163.) It further recognized that "the lack of a sufficient number of judges or courtrooms might constitute good cause to justify the delay of trial under section 1382 in 'exceptional circumstances,'" but "delay arising out of chronic congestion of a court's trial docket cannot be excused." (*Ibid.*) Referencing the general circumstances prevailing in Riverside Superior Court, the Court concluded that "the trial court properly could find that the congested criminal caseload represented a chronic condition rather than an exceptional circumstance, and further that the lack of available courtrooms and judges was attributable to the Legislature's failure to provide a number of judges and courtrooms sufficient to meet the rapidly growing population in Riverside County."[18] (*Id.* at p. 1164.) The Court also explained: "[T]he applicable California statutes do not require a chronically underfunded and understaffed court such as the Riverside Superior Court either (1) to accommodate last-day criminal proceedings by devoting an unreasonable or disproportionate share of its resources to ensure that all last-day matters will be tried within the presumptive statutory period, or (2) to continue such

---

[18] In a footnote, *Engram* explained that "[t]he lack of a number of judges sufficient to handle the matters pending in the Riverside Superior Court [was] a long-known and well-documented problem." (*Engram*, *supra*, 50 Cal.4th at p. 1165, fn. 13.) In 2004, a study by the Judicial Council found that approximately 350 additional new judgeships were needed statewide and that the Riverside Superior Court was one of the trial courts most in need of new judgeships. (*Ibid.*) In 2008, a Judicial Council report to the Legislature regarding the need for new superior court judgeships, the Riverside Superior Court was ranked first in unmet judicial needs. (*Ibid.*)

trials beyond the presumptive statutory period (rather than dismiss the criminal proceedings) on the premise that the persistent backlog constitutes 'good cause' under section 1382 to justify a delay. The calendar congestion that produced the circumstance in which the numerous last-day criminal cases pending in the superior court exceeded the resources available to the court unquestionably constituted a chronic condition. It cannot properly be characterized as an 'exceptional circumstance.' " (*Id.* at p. 1165.)

Here, we conclude the trial court did not abuse its discretion in finding good cause for continuing Valdivia Torres's trial on August 16 and September 2 or Hernandez-Valenzuela's trial on September 24. The District Attorney satisfied his burden of establishing good cause for these continuances.

In making a determination of good cause for not bringing a defendant to trial within the statutory time frame for reasons of court congestion or backlog, the Supreme Court explained that the critical inquiry is whether the congestion or backlog is attributable to chronic conditions as opposed to exceptional circumstances considering all of the relevant circumstances. (*Johnson, supra*, 36 Cal.3d at p. 572; *Engram, supra*, 50 Cal.4th at p. 1163.) The District Attorney adequately showed respondent court's backlog resulting in the delay of petitioners' trials was attributable to exceptional circumstances connected to the COVID-19 pandemic, not chronic conditions in respondent court.

The COVID-19 pandemic has been a " 'unique, nonrecurring event[]' " which " 'ha[s] produced an inordinate number of cases for court disposition,' " and thus exceptional circumstances justifying delay of petitioner's trial. (*Johnson, supra*, 26 Cal.3d at p. 571.) From early March 2020 to June 28, 2021—when respondent court fully reopened—respondent court was unable to operate at its usual capacity for approximately fifteen months due to safety

22

orders imposed by health officers in response to the pandemic. During three of the fifteen months, jury trials were suspended by the Chief Justice's statewide emergency orders. The Chief Justice's blanket 90-day extension of the last days of all criminal jury trials with last days between March 16, 2020, and June 15, 2020, reflected the challenge of conducting jury trials during the pandemic. As the Chief Justice explained, courts were a "high risk" environment during the pandemic given they required the assembly of judges, court staff, litigants, attorneys, witnesses, defendants, law enforcement, and juries in excess of the number allowed for gathering under governing health orders. Criminal jury trials in respondent court were suspended again for another month during the surge of community spread of COVID-19 in December 2020. During the other months that jury trials were not suspended, respondent court was limited to using only four of its ten trial courtrooms for criminal jury trials due to social distancing requirements imposed by health orders. None of these events were the fault of the prosecution or respondent court but rather the unprecedented effects of the pandemic.

When respondent court reopened on June 28, 2021, after fifteen months of diminished or no capacity to conduct criminal jury trials, it was not surprising that it confronted an " 'inordinate number of cases for court disposition.' " (*Johnson*, *supra*, 26 Cal.3d at p. 571.) The pandemic had severely limited its ability to conduct jury trials. Upon reopening, scores of no-time-waiver felony cases past their statutory day had accumulated during the 15-month period of limited operations. As of August 29, 2021, respondent court's jury trial list indicated there were approximately 220 no-time-waiver felony cases with original last days sometime in the 15-month period before reopening. The District Attorney explains that respondent court attempted

23

to address this backlog by prioritizing older cases first when it reopened. Respondent court assigned trials out in order of their statutory last days, prioritizing three courtrooms for in-custody felony trials and maintaining the remaining courtrooms for out-of-custody trials with earlier last days.

It was in this context in which petitioners' trials were called and continued on August 16, September 2, and September 24, since on those dates other defendants with earlier last days than petitioners—most of whom with last days fell within the 15-month period before reopening—were still awaiting trial. After fifteen months of constrained operations resulting in a backlog of numerous no-time-waiver cases, it was not unreasonable for respondent court to not have addressed its backlog within seven, nine, or twelve weeks of reopening, that is, by Valdivia Torres's August 16 and September 2 last days, or by Hernandez-Valenzuela's September 24 last day. Moreover, it was not unreasonable after those fifteen months for the court to need some latitude to determine how best to addressing its backlog, while the pandemic persisted despite the full reopening. (See *Sutton*, *supra*, 48 Cal.4th at p. 555, fn. 10 [quoting ABA standards which observe that it is unfeasible to expect the same prompt disposition of court business when a unique, nonrecurring event results in many cases for disposition and advocating for "some leeway for additional time" in such circumstances].) The method the court chose of advancing cases from the backlog by order of their statutory last days did not reflect court mismanagement. Rather, it was a reasonable approach in line with priorities set forth in section 1048[19] and not

---

[19]     Section 1048 states in relevant part:  "(a) The issues on the calendar shall be disposed of in the following order, unless for good cause the court directs an action to be tried out of its order: (1) Prosecutions for felony, when the defendant is in custody.  (2) Prosecutions for misdemeanor, when the

detrimental to the good cause finding. Based on the totality of these circumstances, it was not an abuse of discretion for the respondent court to conclude that the backlog delaying petitioners' cases was attributable to exceptional circumstances constituting good cause and to continue their trials.

Petitioners contend that "the COVID-19 pandemic can no longer serve as blanket good cause for continuing trials" "thanks to a successful vaccination campaign and the lifting of capacity and social distancing requirements, respondent court has been open for criminals jury trials with a full complement of courtrooms since June 2021." Notwithstanding the availability of vaccines, the lifting of social distancing requirements, and respondent court's reopening, we would be remiss to conclude the pandemic was over or its effects on court operations completely abated on the dates petitioners' cases were called. On those dates, there was no indication that the Governor's state of emergency had been lifted. San Francisco health officer's June 2021 order, which lifted social distancing requirements and indoor capacity limits and paved the way for respondent court's reopening, noted that while the public health threat from COVID-19 was decreasing in the county, the virus "continues to pose a risk especially to individuals who are not fully vaccinated, and certain safety measures continue to be necessary to protect against COVID-19 cases and deaths." The COVID-19 health emergency continued to persist and governmental entities continued to be subject to health orders to limit transmission risk of COVID-19 and contain COVID-19 outbreaks. In short, the pandemic was not a thing of the

defendant is in custody. (3) Prosecutions for felony, when the defendant is on bail. (4) Prosecutions for misdemeanor, when the defendant is on bail." (§ 1048, subd. (a).)

25

past nor had the court returned to business-as-usual when petitioners' cases were called for trial.

Petitioners further contend that even with the large backlog, there can be no good cause for the continuances because respondent court "was not actually *congested*," which petitioners assert is a prerequisite to a good cause finding. They argue that when the prosecution seeks to rely on court congestion to avoid dismissal, it must not only prove that exceptional circumstances exist but also that the court was "*actually congested*—in other words, that the delay was due to the 'unavailability of a judge or courtroom.' " They emphasize that respondent court left half of its criminal courtrooms unused in late August and September 2021, and that on their respective statutory last days respondent court had multiple available criminal trial courtrooms.

We disagree that the open courtrooms preclude respondent court's good cause finding. In *Hajjaj, supra,* 50 Cal.4th 1184, the Supreme Court recognized that "a *broad variety* of unforeseen events may establish good cause under section 1382" and that the unavailability of judges or courtrooms sufficient to handle a court's caseload due to chronic congestion of the court's docket was not such an event. (*Id.* at p. 1198, emphasis added.) In contrast, the backlog pending in respondent court at issue here has not been due to chronic congestion, but rather the result of a global pandemic—a "*unique, nonrecurring event*[] [that has] produced an inordinate number of cases for disposition" and which may properly regarded as an exceptional circumstance that would support a court's good cause determination. *(See id.* at p. 1204; *Johnson, supra,* 26 Cal.3d at p. 571; see also *Arreola v. Municipal Court* (1983) 139 Cal.App.3d 108, 114 ["While chronic congestion will not constitute

26

good cause, court backlogs caused by *exceptional circumstances* will excuse delay in bringing a defendant to trial."].)

Even so, petitioners further contend that no "such exceptional circumstances exist" because the backlog was caused by "routine docket congestion" which was "now overwhelmingly attributable to [respondent court's] own poor administration of its trial docket" in the months since reopening. They describe the unused courtrooms in August and September 2021 as a "stunning decision" by respondent court and a clear example of " 'improper court administration' and 'institutional shortcomings.' "

As an initial matter, we reject petitioners' assertions that respondent court's backlog arose from "routine" docket congestion or represented a "chronic" condition. Notably, petitioners acknowledge that the court's "backlog was originally caused by public health restrictions to combat the covid-19 pandemic." Thus, the backlog petitioners' cases were a part of was due at least in part to the pandemic and thus far from a routine event. (See, e.g., *Stanley*, *supra*, 50 Cal.App.5th at p. 170 [describing COVID-19 pandemic as an "emergency that has overwhelmed the nation and much of the world"].) Petitioners' own analyses show the backlog was not simply a routine backlog divorced from the pandemic. For instance, Valdivia Torres notes, "[A]s of September 1, almost half the backlog consisted of cases with statutory deadlines *after* respondent court's reopening on June 29." This means the majority of no-time-waiver felony trials in the backlog as of September 1 were cases whose last days fell during the 15-month period of constrained courtroom operations caused by the pandemic. This consisted of more than 200 cases with defendants charged with felonies with last days *before* respondent court's reopening were awaiting trial when Valdivia Torres's case was called on September 2.

27

Nor can we agree that respondent court's backlog was "chronic" when Valdivia Torres's cases were called on August 16, September 2, and Hernandez-Valenzuela's case was called on September 24. On those dates, it had been seven, nine, and twelve weeks, respectively, since the court's full reopening on June 28. Even at the longer end, a twelve-week backlog is of a significantly shorter duration than the years-long congestion the Supreme Court in *Engram* deemed to be a "chronic condition." (*Engram, supra*, 50 Cal.5th at p. 1164.) Petitioners have provided no authority for its view that the seven, nine, or twelve-week delay should be regarded as chronic, and we see nothing "routine" or "chronic" about the backlog facing respondent court.

As to the empty or available courtrooms on the day petitioners' cases was called, evidence included by petitioners in the record includes documentation that several departments in respondent court's Hall of Justice did not hold trials or held only limited trials throughout August and September. The District Attorney acknowledges that departments 26, 27, and 29 did not hold a trial throughout August; Department 10 did not hold a trial throughout August except for August 31; and Departments 16, 19, 21, 27 and 29 did not hold trials throughout September. Valdivia Torres also included evidence, admitted by the District Attorney, that on August 16, when his case was called, there were at least four departments in the Hall of Justice not engaged in trial and on September 2, the next time his case was called, there were seven departments. Similarly, Hernandez-Valenzuela included evidence, admitted by the District Attorney, that on September 24, when his case was called, there were at least six departments in the Hall of Justice not engaged in trial. Yet these open courtrooms are not dispositive or fatal to the court's good cause finding.

That courtrooms were sitting empty when hundreds of defendants were

28

past their statutory last days is both startling and troubling in light of the backlog. On its face, these empty courtrooms—including the ones available on the days petitioners' cases were called for trial and continued—appear to undermine respondent court's own assertion that providing defendants with the timely hearing of these cases is of the greatest import to the court. However, these unused courtrooms do not mean respondent court was not undertaking efforts to reduce its backlog. The District Attorney explains that in sharp contrast to the 41 no-time-waiver cases the court was able to assign to the four courtrooms during the fifteen months of limited operations, respondent court advanced 221 no-time-waiver felony trials in the six months since reopening. Of those, 38 were assigned to a trial courtroom but most of these (24) were resolved without trial. As to the remaining advanced cases, they were not assigned to a trial courtroom as they were settled, dismissed, or continued.

While unused courtrooms appear to have been an understood consequence of the court's method for advancing cases, their existence also does not mean respondent court was addressing its backlog at the leisurely place the dissent portrays. The dissent observes that in the six-and-a-half months following the court's reopening, respondent court tried to verdict (or hung jury) just five felony cases for in-custody defendants, and that adding the 11 trials conducted for out-of-custody defendants nets a total number of 16 felony trials tried to verdict for the six-and-a-half-month period following reopening. If this were all that respondent court had been doing to address its backlog, we would likewise view it as paltry. But that was not the extent of the court's activities. As noted above, respondent court advanced more than 200 no-time-waiver felony cases for trial in the six-and-a-half months since reopening, though most were ultimately settled, dismissed, or

29

continued. Further, trials and proceedings related to cases set for trial were occurring in respondent court and using courtroom space. The parties stipulated that respondent court held 69 "criminal jury trials" during the six-and-a-half-month period since reopening (June 28, 2021 to January 13, 2022), which included the felony trials recognized by the dissent, a number of other felony trials that did not reach verdict but occupied courtroom space, and misdemeanor trials. [20] Simply put, significant efforts were being made to address the backlog.

---

[20] The parties aver that the exhibit attached to their stipulation "accurately reflects the criminal jury trials held by respondent court for the period from March 16, 2020 to January 13, 2022." According to that exhibit, from March 16, 2020 to January 13, 2022, there were 69 "criminal jury trials" of which 28 were tried to verdict, nine were dismissed at some unknown stage of the proceedings, 16 were resolved by plea agreement at some unknown stage of the proceedings, and six remained ongoing as of January 13, 2022. The remaining cases were either continued or diverted, a bench warrant was issued, or a mistrial was declared. Footnote 3 in the dissent references this stipulation and notes that 28 trials is a "small fraction" of the number of criminal jury trials compared to respondent court's average between late 2009 and early 2018 of 285 criminal trials per year—a figure provided by the District Attorney. While we do not question that there has been a dramatic decrease in the number of criminal jury trials in respondent court since reopening compared to pre-pandemic times, we are unable to determine if the drop off has been as severe as the dissent suggests. The District Attorney does not identify the source of his 285-average count, nor does he explain what constitutes a "criminal jury trial" in this count. Moreover, the parties' stipulation—which includes in its tally of "criminal jury trials" cases resolved without jury involvement—suggests the annual averages cited by the District Attorney may be similarly defined and could also include cases that were not completely tried to verdict or hung jury. Without a clear record before us, we can only conclude there has been a significant decline but cannot attach definite numbers to it. Even so, this decline does not detract from our view that respondent court should be granted some leeway in addressing its backlog following the exceptional circumstances wrought by the pandemic.

Accordingly, at this stage, we cannot declare the backlog to be the result of court mismanagement or improper administration in light of the unique and unprecedented pandemic-related challenges which strained respondent court's operations for fifteen months, the impacts of which continued in the months after reopening. As this court stated in *Lewis v. Superior Court* (1981) 122 Cal.App.3d 494, "It is not our function to interfere with the trial court in its administration of the calendar or assignment of judges," (*id.* at p. 498) only to determine whether delays are due to exceptional circumstances or arise out of chronic docket problems. To that end, in light of the 15-month constraints on court operations that preceded the reopening and left scores of delayed cases ready for trial upon reopening, we cannot conclude the delays arose out of chronic docket problems rather than exceptional, pandemic-related circumstances.

Lastly, petitioners assert "the trial court's decision to prioritize civil proceedings—holding trials in asbestos, medical malpractice and other non-urgent cases while more than a hundred people sit in custody awaiting their trials—fatally undermines its good cause finding." They argue this "unlawful prioritization" of civil proceedings fatally undermines respondent court's good cause finding and mandates dismissal. They also contend civil courtrooms at the Civic Center Courthouse should be reassigned to hear criminal trials, rather than non-urgent civil cases for which they are presently being used. On these points, we readily disagree.

Section 1050, which petitioners rely on in support for their "unlawful prioritization" argument, states, "criminal cases shall be given precedence over, and set for trial and heard without regard to the pendency of, any civil matters or proceedings." (§ 1050, subd. (a).) However, the Supreme Court in *Engram* acknowledged Section 1050 is " 'directory only and does not mandate

31

dismissal of an action by its terms.' " (See *Engram*, *supra*, 50 Cal.4th 1131, 1151, fn. 8.) The *Engram* court also concluded that the chronically underfunded and understaffed Riverside Superior Court had no statutory obligation accommodate criminal proceedings on their last day "by devoting an unreasonable or disproportionate share of its resources to ensure that all last-day matters will be tried within the presumptive statutory period." (*Id.* at p. 1165.) Since we are of the view that respondent court's backlog had not reached a point where it can be fairly described as "chronic," there is even greater reason to not mandate how it directs its resources.

In addition, petitioners have not persuaded us that failure to reassign civic courtrooms at the Civic Center Courthouse to hear criminal trials precludes respondent court's good cause finding. In making its good cause finding, respondent court noted that use of the Civic Center Courthouse was not a viable option for felony or violent misdemeanor cases because of the inability to provide adequate security. It also noted there were not enough bailiffs to staff each courtroom. Thus, only nonviolent misdemeanor trials were the only criminal matters that could be held there, and some had since reopening. With its returns, the District Attorney supplied the declaration of Chief Kevin McConnell, the Chief Deputy with the San Francisco Sheriff's Office, who oversees respondent's security at both its Hall of Justice criminal courthouse and the Civic Center Courthouse. Chief McConnell stated the Civic Center Courthouse lacked security devices designed to prevent escape, which are features of the Hall of Justice. For additional in-custody criminal matters at the Civic Center Courthouse, additional holding cells would need to be constructed, and various locks and cameras, secure entrances, and additional emergency communication devices would need to be installed. In addition, thirteen more full-time Sheriff staff would be needed to staff

32

additional criminal matters at the Civic Center Courthouse. These security and structural concerns related to the Civic Center Courthouse provide further reason to not fault respondent court from not assigning additional criminal matters there.

We respectfully disagree with the dissent's reliance on *People v. Echols* (1954) 125 Cal.App.2d 810, 818 (*Echols*) and *Sigle v. Superior Court* (1954) 125 Cal.App.2d 747, 748 (*Sigle*), to argue that good cause has not been shown because respondent court had departments that could have been but were not used to try petitioners' cases. The delays in *Echols* and *Sigle* arose because there were not enough judges for the criminal court. (See *Echols*, *supra*, 125 Cal.App.2d at p. 813 [trial court observations that there were insufficient judges and not all departments of superior court were "fully manned or occupied"]; *Sigle*, *supra*, 125 Cal.App.2d at pp. 748–749.) Thus, they better reflect the type of chronic condition attributable to the fault or neglect of the state that generally does not constitute good cause. More critically, neither case came on the heels of pandemic which shuttered or severely constrained court operations for a 15-month period and which was not the fault of the state. As such, neither *Echols* nor *Sigle* addressed a court's response to the impact of the type of exceptional and extraordinary event that is currently facing respondent court. In short, we disagree with the dissent's assessment that the situation before respondent court is akin to the predicament the court was in in 1954 when *Echols* and *Sigle* were decided or that the good cause analysis in those cases applies here.

In sum and in consideration of the totality of the circumstances, we conclude that respondent court's backlog which has delayed petitioners' trials was the result of exceptional circumstances arising from the COVID-19 pandemic. Accordingly, the trial court did not abuse its discretion in finding

33

good cause existed to continue Valdivia Torres's trial on August 16 and September 2, and to continue Hernandez-Valenzuela's trial on September 24, and thus made no error in denying their' motions to dismiss under section 1382.

Having reached this decision, we, like respondent court and other courts which have recently confronted motions to dismiss brought by defendants on speedy trial grounds, are mindful that the right to a speedy and public jury trial is among the most important protections guaranteed by our constitution and one that may not be cast aside during times of uncertainty. (See *United States v. Olsen* (9th Cir. 2022) 21 F.4th 1036, 1049.) Petitioners have alleged that people incarcerated in the San Francisco County Jail face harsh conditions of confinement that coupled with the uncertainty about when trial will come, lead to grave mental suffering. However, the COVID-19 pandemic presented trial courts with unprecedent challenges, including when and how to conduct jury trials without endangering public health and safety while not undermining defendants' right to a jury trial. The challenges faced by trial courts have been made even more difficult and frustrating by the unpredictable course of the pandemic. The emergence of new variants, the regular changes to health orders and the attendant restrictions on workplaces and public gatherings, and the pandemic's unknown duration have undoubtedly made courtroom administration far from straightforward. For respondent court, those challenges appear to have been acute based on its single criminal courthouse at the Hall of Justice and the nature of that structure. We acknowledge respondent court's efforts to address these formidable challenges in a constantly changing pandemic environment. After fifteen months of constrained operations, respondent court's substantial backlog is neither

surprising nor unreasonable and in our view readily attributable to the pandemic. The manner in which respondent court sought to address these cases was also not unreasonable and a response necessitated by the pandemic. When Valdivia Torres's case was called on August 16 and September 2—only seven and nine weeks following the court's reopening— and when Hernandez-Valenzuela's case was called on September 24—twelve weeks following the reopening—their trials were regrettably but understandably delayed by this pandemic-induced backlog.

Even so, we agree with petitioners that respondent court cannot turn to the pandemic and "perpetually cite 'exceptional circumstances' to avoid dismissal under section 1382." At some future point, should respondent court's backlog persist while courtrooms remain dark and unused for long stretches of time, a backlog that originated with the pandemic could transform into one that persists or grows due to court administration, or the nonuse of available judicial resources. Here, we only decide that on August 16, September 2, and September 24, that point was not reached, and we decline to adopt any outside time limitation or metric that establishes such a point.

Again, we commend respondent court along with its justice partners for making significant efforts to bring its criminal cases to trial in light of constitutional and statutory requirements in the context of an unprecedented and unpredictable pandemic. However, in light of its apparently growing backlog of pending criminal trials, we also urge respondent court to consider even more measures to adopt, which could include but are not limited to expanding the number of trial courtrooms in the Hall of Justice beyond the number that was standard pre-pandemic, reassigning additional judicial officers from other departments in the Civic Center Courthouse or Hall of

35

Justice, or using visiting or retired judges to cover courtroom vacancies. Respondent court's backlog which was borne of exceptional circumstances must be met with an equally exceptional response to ensure that our recognition of a defendant's speedy trial rights as a critical constitutional protection is not merely lip service.

## DISPOSITION

The petitions for writ of mandate or prohibition are denied, and the orders to show cause discharged.

_____

Petrou, J.

I CONCUR:

_____

Rodríguez, J.

TUCHER, P.J., Dissenting:

I agree with much of what the majority has written, particularly the peroration with which it closes: "Respondent court's backlog which was borne of exceptional circumstances must be met with an equally exceptional response" if the speedy trial rights of criminal defendants are to be honored. I commend respondent court for having conducted felony trials for in-custody defendants through the most difficult months of Covid-19 but am confounded by its failure to try more of these cases after fully reopening in June 2021. Three months after reopening, on two different days in September 2021, petitioners appeared as in-custody defendants on the trial calendar, announced they were ready for trial, and objected as their cases were continued months into the future. For both men, the statutory period during which they were supposed to have been brought to trial had run. (See Pen. Code, § 1382, subd. (a)(2).) On both dates when their cases were called for trial, multiple trial courtrooms in the Hall of Justice were *not* busy trying cases. Indeed, the record shows that half of the 11 courtrooms designated as trial departments in the Hall of Justice tried no cases in the weeks before or after these two defendants were told there was no courtroom available to try their case. Under the circumstances and as set forth more fully below, I conclude respondent court's "good cause" finding was an abuse of discretion.

## BACKGROUND

San Francisco has 56 active judges assigned to courtrooms around the city, 22 of them in the Hall of Justice, where half of these are designated for holding criminal trials.[1] Historically, respondent court has also held some

---

[1] I take judicial notice of Exhibit 26 in support of petitioners' motions to dismiss, a San Francisco Superior Court document dated August 23, 2021 specifying which judge is assigned to preside over what kind of proceedings in

1

criminal trials at the Civic Center Courthouse, but since the onset of Covid-19 the only criminal trials held in the Civic Center Courthouse have been nonviolent misdemeanor trials. Holding cells there are allocated entirely to family court and juvenile dependency proceedings, and the Sheriff's Department pleads lack of resources to staff additional criminal trials at the Civic Center Courthouse even for cases in which no defendant or witness is in custody. This means that the 11 courtrooms in the Hall of Justice designated for criminal trials are the only courtrooms in San Francisco where felony trials and trials of violent misdemeanors are taking place.

Covid-19 was exceedingly disruptive to court operations. For a 15-month period beginning mid-March 2020, respondent court operated at a sharply reduced capacity to comply with various health mandates. During this period, the court was able to conduct some felony trials for in-custody defendants—an average of about one per month—and some misdemeanor trials for defendants who were out of custody. Then in mid-June 2021 the San Francisco health officer lifted indoor capacity limits and social distancing requirements, and the court publicly announced it was returning to "pre-pandemic" levels of service on June 28. By the time of reopening, a predictably large number of no-time-waiver cases awaited trial: 153 in-custody felony cases, 197 out-of-custody felony cases, and 212 misdemeanor cases.

---

each department. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).) According to these published judicial assignments, Departments 10, 13, 16, 19, 21, and 24-29 in the Hall of Justice are designated to hear criminal trials, although some of these departments also hear motions or other types of hearings, especially on Fridays.

2

Yet in the months that followed, respondent court sent the most serious of these cases out to trial at a leisurely pace. In the first three months after June 28, the court sent out only three in-custody felony trials, one of which resolved before jury selection and *two* of which were tried. This paltry record does not improve if we widen the lens: from reopening until January 13, 2022—a period of six-and-a-half months—respondent court tried to verdict (or hung jury) just *five* felony cases for in-custody defendants.[2] These numbers—two trials in three months and five trials in six-and-a-half months for the entire court—mean felony trials for in-custody defendants occurred slightly *less* frequently after reopening than they did during the most disruptive period of the pandemic.

Respondent court did conduct other criminal trials during this same period. From reopening until October 1, 2021, the court held three felony trials and seven misdemeanor trials for out-of-custody defendants, bringing the court-wide total of trials over this three-month period to twelve. Again, widening the lens does not substantially improve the picture: during the first six-and-a-half months following reopening, the court tried 11 out-of-custody felony defendants to verdict or hung jury, bringing the court's total number of felony trials to 16. This is an average of slightly more than two per month for the entire court. Although the court was also trying misdemeanor cases during this period, the total number of criminal trials the court has

---

[2]     Although case information after about October 1, 2021 was not before respondent court when it denied petitioners' speedy trial motions, the parties have stipulated that we may consider their joint exhibit listing criminal jury trials held by respondent court from March 16, 2020 to January 13, 2022.

conducted since reopening is dramatically lower than the number of criminal trials it held under "pre-pandemic levels" of service.[3]

The pace at which these cases were assigned out for trial was so slow that the backlog of felony cases actually grew instead of shrinking in the months following reopening. From June 29 to September 10, 2021, the number of in-custody defendants awaiting felony no-time-waiver trials climbed from 153 to 218. The number for out-of-custody felony defendants rose from 197 to 217. Only the misdemeanor backlog shrank during this period, from 212 to 137 no-time-waived cases.

As the felony backlog grew so, too, did the length of time defendants in the county jail had to wait before their cases were sent out for trial. The three in-custody defendants whose felony cases were sent to trial courtrooms in June 2021 each waited about five-and-a-half months past their statutory last days for their chance at a trial. The three in-custody defendants whose felony cases were sent out in December 2021 waited *eight months past their statutory last days*. Since the statutory last day falls 60 days after a defendant is arraigned on an information or withdraws a general time waiver, the eight months of additional delay mean that defendants were waiting five times as long for their trials to begin in December 2021 as the maximum time the statute would normally allow (i.e., 10 months, not two). (Pen. Code, § 1382, subd. (a)(2).)

---

[3] The parties report 28 criminal cases (felony or misdemeanor) tried to verdict or hung jury from reopening until January 13, 2022, plus one case that ended in a mistrial for unspecified reasons and six trials begun but not concluded by January 13. This is a small fraction of the number of criminal jury trials conducted between late 2009 and early 2018, when respondent court averaged 285 criminal jury trials per year, according to the People.

4

Instead of reacting with urgency to the backlog that built up through June 2021, respondent court allowed the trial departments at the Hall of Justice to limp along at half strength after reopening. We see this when we look at the particular dates in September on which petitioners' cases were called for trial.

Petitioner Valdivia Torres's case was called on September 2, 2021, his second time on the trial calendar since his statutory last day came and went earlier in the summer. On September 2, 2021, there were three misdemeanor trials underway in the Hall of Justice and one trial in an out-of-custody felony case. That's all. Just four of the 11 trial departments were holding trials, and none of them for an in-custody defendant facing felony charges. The record reveals that Department 16 had not been in trial since August 20, and would not be again until at least November. Department 19, which had held no trials during the first four weeks after reopening, was in the midst of a 50-day trial hiatus. Department 21 handled no trials in all of September. Department 27 had not been sent a trial since July 21, and would not be sent another one until October 8. As for Departments 26 and 29, although these were ostensibly trial departments, neither had been sent a single trial since before respondent court reopened in June, and Department 29 would not see a trial until mid-October. Nothing in the record explains these long periods in which so many "trial" departments were sent no cases to try, and in spite of this under-used capacity, respondent court told petitioner Valdivia Torres on September 2 that it did not have a courtroom available to try his case. The court continued his case until December and in December, again over Valdivia Torres's objection, continued it until February. By the time Valdivia

5

Torres's case was finally called for trial on February 22, 2022, it was eight months after his statutory last day.

The picture was similar on September 24, 2021, when Hernandez-Valenzuela's case appeared on the trial calendar on its statutory last day. On September 24, Hernandez-Valenzuela had been in custody for almost four months, held without bail. Department 25 was in the middle of a felony trial, and Department 13 was trying a misdemeanor case. Department 10 had begun and recessed a trial that would soon resolve, but no other criminal trial was underway anywhere in the Hall of Justice. That is, eight of 11 "trial" departments were not in trial. The record reveals that Departments 16, 19, 21, 27 and 29 were in the midst of weeks-long (or months-long) periods without a single trial, and Departments 24, 26, and 28 were trial-free for at least that day. Yet Hernandez-Valenzuela was told no courtroom was available for his trial because the courtrooms were needed for other, even older, trials. He was sent back to the county jail to await a new court date in late February. Now in March, Hernandez-Valenzuela is more than five months past his statutory last day, and still we have not heard that he has been brought to trial.

## ANALYSIS

Whether there is "good cause" for delaying a trial past the statutory last day is a discretionary decision that requires the trial court to " ' "apply[] principles of common sense to the totality of circumstances." ' " (*People v. Hajjaj* (2010) 50 Cal.4th 1184, 1197 (*Hajjaj*).) In exercising this discretion, courts consider factors such as " '(1) the nature and strength of the justification for the delay, (2) the duration of the delay, and (3) the prejudice

to either the defendant or the prosecution that is likely to result from the delay.' " (*Ibid.*)

The duration of the delays in petitioners' cases and the resulting prejudice are both significant. Each petitioner has languished in jail for multiples of the 60-day period the Legislature established as the presumptive maximum for a speedy trial. (See Pen. Code, § 1382, subd. (a)(2).) "A defendant who is incarcerated pending trial . . . suffers particular harm when he is denied his right to trial within the statutory period." (*People v. Johnson* (1980) 26 Cal.3d 557, 569 (*Johnson*).)[4] For this reason, the Legislature directs that felony cases for in-custody defendants should be given highest priority among criminal cases. (Pen. Code, § 1048, subd. (a).)

Respondent court nonetheless found "good cause" because it considered the delays in Valdivia Torres's and Hernandez-Valenzuela's cases as amply justified by the extraordinary backlog in no-time-waived cases that resulted from Covid-19 disruptions. I cannot agree. Certainly, the prevalence in our community of a highly infectious disease like Covid-19 constituted good cause for continuing trials when it made the convening of public trials impossible. I joined the decision in *Stanley v. Superior Court* (2020) 50 Cal.App.5th 164 on that basis. But nobody argues Covid-19 prevented respondent court from trying criminal cases in the summer and fall of 2021, so the pandemic is not a

---

[4] This prolonged loss of liberty while awaiting trial is the primary prejudice, but both petitioners also suffer additional detriment because of Covid-19 precautions at the County Jail. For instance, according to declarations petitioners submitted, jail inmates have been unable to have in-person visits with family members, time spent out of their cells is severely restricted, and opportunities to exercise are sharply limited. The pandemic may have made such measures advisable, but these hardships only magnify the urgency of bringing cases for in-custody defendants to trial.

sufficient explanation for not bringing petitioners to trial. Respondent court has explained that Covid-19-related resource constraints prevent it, for the time being, from holding felony trials in the Civic Center Courthouse, a factual determination I accept given our standard of review. But nobody suggests that Covid-19 interferes with holding jury trials in the 11 courtrooms in the Hall of Justice that are designated for that purpose. Perhaps to explain its under-utilization of that capacity, respondent court emphasizes that since reopening it has called a good many cases on the criminal trial calendar that have settled or been continued, so that those trials did not proceed. But if so many cases were settling and being continued, the court does not explain why it did not call more cases for trial, sending those that did not settle or request continuances out to trial departments, where one case could begin trial and other(s) could trail in case the lead case settled. It is true that having a courtroom available for, but not immediately engaged in, trying a case can facilitate settlement by lending urgency to settlement negotiations. But there is no reason to leave multiple vacant courtrooms for that purpose.

Moreover, nobody has suggested the trial departments that were not trying cases in September were busy settling them. When we invited respondent court to explain why petitioners' cases could not have been sent out for trial on August 16 (when Valdivia Torres's case was earlier on the trial calendar), on September 2, or on September 24, we were not told that trial departments were facilitating settlement negotiations. Nor were we told they were handling time-sensitive preliminary hearings or other matters that took precedence. Instead, respondent court reported that on August 16 three judges in trial departments at the Hall of Justice were "on pre-approved

8

absence," and a fourth was covering for the pre-approved absence of a judge down the hall. Department 29 was simply "[v]acant." On September 2, two trial judges were "on pre-approved absence," a third was covering for a neighbor's pre-approved absence, a fourth lacked a courtroom clerk, and Department 29 was once again "[v]acant."[5] On September 24, one judge was "on pre-approved absence," one was covering for a neighbor's pre-approved absence, two were covering other calendars, and one had a courtroom clerk who had called in sick. This recitation does not convey that fully utilizing the 11 trial courtrooms in the Hall of Justice was a high priority for respondent court on the dates in question.

If the trial departments in the Hall of Justice had been consistently operating at something approaching full capacity, I would have no quarrel with a good-cause finding for defendants whose cases still could not find an available courtroom. Of course, a backlog of hundreds of cases, built up over 15 months, will not dissipate in mere days or weeks. Quite reasonably, respondent court generally prioritized older cases over newer ones. Also reasonably, respondent court set aside—or at least reported it had set aside— three trial courtrooms to try in-custody felonies even when out-of-custody defendants had older cases, in light of the liberty interest of defendants being detained pre-trial.[6] But none of these explanations justifies Valdivia Torres

---

[5]    In addition to these "dark" courtrooms, respondent court reported one "open" courtroom on September 2, which was scheduled the next day to conclude a multi-part preliminary hearing. But according to petitioner Valdivia Torres, the court had already heard all of the evidence in the preliminary hearing and could have decided whether to issue its holding order during a recess, had it been sent a jury trial.

[6]    Said the trial court, in finding good cause to continue Valdivia Torres's trial in August 2021: "The plan is to have three courtrooms at the Hall of Justice to continue handling in custody no time waiver trials, and the

9

and Hernandez-Valenzuela not being brought to trial when their cases were called in September 2021. Respondent court was not chipping away at its backlog; it was allowing the backlog to grow. It was not fully engaged in trying cases that were older than petitioners'; more than half the trial courtrooms in the Hall of Justice were not conducting trials at all. And far from setting aside three departments for in-custody felony trials, respondent court sent out *only a single in-custody felony defendant for trial during the entire month of September*.

I acknowledge that no judge should be required to preside over back-to-back trials for months on end, and that non-trial work may on occasion take precedence. (See, e.g., *Bullock v. Superior Court* (2020) 51 Cal.App.5th 134, 156 [discussing preliminary hearings].) Vacations, sick leave, and other court needs must be accommodated, but if respondent court is only able to hold felony trials in 11 of its 56 courtrooms, then it behooves the court to manage its resources in such a way as to operate those 11 trial departments at, or near, full capacity. If a judge in one of the trial departments takes a vacation or is out on extended leave, another active judge from elsewhere in the court can be substituted in to preside over criminal trials until the assigned judge returns. Or the court can try requesting the assistance of a retired judge for a month or two. (See Temporary Assigned Judges Program Factsheet (July 12, 2020) <https://www.courts.ca.gov/documents/TAJP_Fact_Sheet.pdf> [as of Mar. 3, 2022].) And when calendars elsewhere in the Hall of Justice need

remainder to handle out of custody felony and violent misdemeanor trials." The court intended to reserve three courtrooms for in-custody felony defendants, even when they had a later last day than an out-of-custody defendant, because "those who await trial with a loss of liberty have a heightened need for resolution [compared to] those who await trial out of custody."

10

covering, judges who normally work in the Civic Center Courthouse can be sent as substitutes so as not to deprive the criminal trial courtrooms of necessary personnel. Similarly, if a courtroom clerk calls in sick, then a clerk who is cross-trained to work criminal trials can be sent to fill in. Although respondent court's manager for criminal courtroom clerks submitted a declaration detailing clerk absences in September, she did not address the crucial question of whether respondent court had clerks trained to work in criminal trial courtrooms who could have been redeployed there to help. It is the People's burden to prove that it was not possible to bring petitioners to trial when their cases were called in September (*People v. Echols* (1954) 125 Cal.App.2d 810, 816 (*Echols*), disapproved on another ground in *People v. Wilson* (1963) 60 Cal.2d 139, 152), and the People have not explained why common-sense solutions such as these could not have been used to get more criminal cases out to trial.

The law of this state has for almost a century required that "criminal cases be given precedence over civil cases." (*People v. Engram* (2010) 50 Cal.4th 1131, 1137 (*Engram*); Pen. Code, § 1050.) If a superior court "does not devote a reasonable proportion of its resources to the trial of criminal cases" it cannot rely on congestion in its criminal courtrooms as good cause for failing to provide defendants a speedy trial. (*Engram*, at pp. 1137–1138; see also *Echols*, *supra*, 125 Cal.App.2d at p. 816.) Numerous "cases establish that when the lack of a judge or courtroom available to timely bring a criminal defendant to trial is fairly and reasonably attributable to the fault or neglect of the state, that circumstance does not constitute good cause to delay the defendant's trial." (*Engram*, at p. 1138.)

11

Respondent court has been in this predicament before, though perhaps not for many years. In June 1954, two divisions of our court decided cases in which criminal defendants in San Francisco Superior Court did not receive speedy trials, reportedly because of crowded conditions in the criminal courtrooms. (*Echols*, 125 Cal.App.2d at p. 818; *Sigle v. Superior Court* (1954) 125 Cal.App.2d 747, 748 (*Sigle*).) In *Sigle*, the court rejected the trial court's finding of good cause, explaining that "a greater number of judges should have been assigned to departments handling criminal matters. . . . [T]he showing that a large number of civil cases were pending does not excuse the failure to assign a sufficient number of judges to handle criminal matters." (*Ibid*.) Similarly, *Echols* held that a defendant "kept waiting until approximately 50 days after" his statutory last day should have had his case dismissed because good cause was not shown. (*Echols*, at p. 815.) The *Echols* court explained, in 1954 San Francisco Superior Court had 23 departments, of which four tried criminal cases. (*Id*. at p. 815.) "With 23 departments to choose from, in order to protect the fundamental rights of persons charged with crime more departments could be assigned criminal cases." (*Id*. at p. 816.) The same is true today. With 56 active judges to choose from, there must have been 11 who could have presided over criminal trials in the Hall of Justice "in order to protect the fundamental rights of persons charged with crime." (*Ibid*.)

Although *Echols* and *Sigle* are old, they remain good law on this point. As recently as 2010, our Supreme Court discussed *Echols* approvingly, along with a pair of cases out of Los Angeles County reaching similar conclusions. (See *Engram*, *supra*, 50 Cal.4th at pp. 1156–1157 [discussing *Echols*, *supra*, 125 Cal.App.2d 810, *Stewart v. Superior Court* (1955) 132 Cal.App.2d 536

(*Stewart*), and *Dearth v. Superior Court* (1940) 40 Cal.App.2d 56, 59 (*Dearth*)].) *Engram* was one of two cases in 2010 in which our high court affirmed that chronic court congestion in Riverside County was not good cause for continuing a defendant's trial past the statutory last day. (See *Engram*, at p. 1163; *Hajjaj*, *supra*, 50 Cal.4th at p. 1198.) " ' " [U]nreasonable delay in run-of-the-mill criminal cases cannot be justified by simply asserting that the public resources provided by the State's criminal-justice system are limited and that each case must await its turn.' " ' " (*Ibid.*)

The backlog in Riverside County was more extensive and long-lasting than the backlog with which respondent court currently contends, but so, too, were the measures undertaken to arrest the backlog there. The Chief Justice assigned "numerous retired judges and active judges from outside the county" to try cases, and Riverside Superior Court "itself devoted virtually all of its resources—superior court judges and courtrooms—ordinarily intended for the trial of civil cases instead to the trial of criminal cases." (*Engram*, *supra*, 50 Cal.4th at p. 1137.) In spite of this almost single-minded focus on trying criminal cases in Riverside County, the high court affirmed that "good cause did not exist under section 1382," so the criminal proceeding in *Engram* was properly dismissed. (*Id.* at p. 1138.) The Court explained that Riverside County's court congestion was attributable to chronic conditions, rather than exceptional circumstances, and so was "reasonably attributable to the fault or neglect of the state." (*Id.* at pp. 1138, 1165.)

Unlike in *Engram*, *supra*, 50 Cal.4th 1131, in the cases before us the issue of whether respondent court's backlog was due to chronic congestion or exceptional circumstances is not dispositive. Here, the pandemic-induced

13

backlog was not the only reason petitioners were denied an earlier trial. Rather, it was respondent court's failure to react to this backlog by concentrating resources on the pressing task of holding criminal trials— especially criminal trials for incarcerated defendants—that consigned petitioners to additional and unnecessary weeks of pre-trial detention. *Engram* teaches that even concerted efforts to try criminal cases will not excuse delays caused by court congestion to which the state has long turned a blind eye. (*Id.* at p. 1138.) But *Engram* does not speak to the circumstance we face here, where "the fault or neglect of the state" takes an entirely different form. (*Ibid.*) Riverside Superior Court "properly . . . provided considerable preference to the trial of [criminal] matters consistent with the general legislative policy embodied in section 1050." (*Ibid.*) Respondent court's failure to do likewise fatally undermines its finding of good cause.

Respondent court stated, in denying petitioners' motions to dismiss, that it was doing the best it could because advancing all criminal cases every three or four days would have been untenable. I do not advocate for such a procedure. It is a strawman, suggesting respondent court takes the view it should not send a criminal case to trial on any given day if, somewhere in the backlog, there is an older case that has not yet been sent out—even though the older case could not be sent out that day because it was not on calendar. The law imposes no such stricture. Respondent court has broad discretion to decide how to calendar its criminal cases, consistent with its "duty . . . to expedite these proceedings to the greatest degree that is consistent with the ends of justice." (Pen. Code, § 1050, subd. (a).) But respondent court also has a statutory and constitutional imperative to provide defendants a speedy trial, if possible. (*Johnson, supra,* 26 Cal.3d at p. 561.) I see no basis for

14

finding "good cause" to continue trials after their statutory last day when multiple trial departments in the Hall of Justice are not conducting trials or otherwise engaged in time-sensitive work that cannot reasonably be handled elsewhere. Adopting whatever schedule for calendaring and advancing criminal trials it thinks is best, respondent court should generally be sending out to trial the oldest felony cases for in-custody defendants that *are* on the calendar on any given day. (Pen. Code, § 1048, subd. (a).) That some of these cases may be marginally less old than the oldest case in the court's backlog would not be a violation of section 1382. Rather, it would be a modest departure from a rule of seniority to ensure trial departments in the Hall of Justice are fully utilized, which is, after all, the only way to bring the backlog down for all defendants as quickly as possible.

More than 40 years ago, our high court held that a defense lawyer's scheduling conflicts do not constitute good cause for delaying a trial. (*Johnson, supra*, 26 Cal.3d at p. 572.) If the deputy public defender assigned a case has a conflicting trial obligation, "the court should inquire into whether the assigned deputy could be replaced by another deputy or appointed counsel who would be able to bring the case to trial within the statutory period." (*Ibid*.) Only if such a substitution is not possible may the court continue the case, *Johnson* explained, and only then does the court "inquire whether the delay is attributable to the fault or neglect of the state." (*Johnson*, at p. 573.) The same analysis should apply here when a particular trial judge or courtroom clerk is not available to try a time-not-waived case. Respondent court should have asked, but did not, the crucial question whether, to the extent criminal trial departments were short a judge or a clerk, some other judge or clerk could have been brought in to ensure that no-

15

time-waived criminal trials would proceed. And because the court never explored options for substituting personnel, instead leaving trial courtrooms sitting empty, we need not reach the question whether the court's backlog is more properly characterized as "chronic" or "exceptional." Either way, the backlog is not a sufficient explanation for why petitioners were not brought to trial in September 2021.

Like the courts in the *Echols* line of cases, I would hold that good cause to delay petitioners' trials has not been shown because respondent court had departments that easily could have been, but were not, used to try their cases. (*Echols*, *supra*, 125 Cal.App.2d 810; *Sigle*, *supra*, 125 Cal.App.2d 747; *Stewart*, *supra*, 132 Cal.App.2d 536; *Dearth*, *supra*, 40 Cal.App.2d 56.) I would grant the petitions for writ of mandate or prohibition, require the trial court to dismiss the pending criminal proceedings, and expect that when charges were re-filed against these petitioners (see *Johnson*, *supra*, 26 Cal.3d at p. 573), respondent court would handle their cases with a fitting sense of urgency.

                                        TUCHER, P.J.

16

Trial Court:      City and County of San Francisco Superior Court

Trial Judge:      Hon. Loretta M. Giorgi

Counsel:          Manohar Raju, Public Defender, Matt Gonzalez, Chief
                  Attorney, Oliver Kroll, Eric Flesichaker and Kathleen
                  Natividad, Deputy Public Defenders, for Petitioners.

                  No appearance for Respondent.

                  Chesa Boudin, District Attorney, Allison MacBeth and
                  Natalie Fuchs, Assistant District Attorneys, for Real Party
                  in Interest.

1